POTTER HANDY, LLP
MARK D. POTTER, ESQ., SBN 166317
RUSSELL C. HANDY, ESQ., SBN 195058
100 East San Marcos Blvd., Suite 400
San Marcos, CA 92069-2988
(760) 480-4162; Fax (760) 480-4170
mark@potterhandy.com

Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re:** | ) Case No.: 09-12234-LA13 |
| **MARIO SUTIC** | ) Chapter 13 |
| **LILIJANA SUTIC** | ) **MOTION TO DETERMINE SECURED VALUE OF REAL PROPERTY; TO STAY POST PETITION PAYMENTS AS TO THE SECOND DEED OF TRUST; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION IN SUPPORT THEREOF** |
| Debtors | ) |
| | ) Pursuant to §§ 1322(b)(2) and 506(a) |
| | ) **DATE**: December 8, 2009 |
| | ) **TIME**: 11:00 a.m. |
| | ) **DEPT**: 2 |

TO THE HONORABLE LOUISE DECARL ADLER, UNITED STATES BANKRUPTCY JUDGE, DAVID L. SKELTON, CHAPTER 13 TRUSTEE, VILLA CAPITAL, INC. AND ALL OTHER PARTIES IN INTEREST:

Mario Sutic and Lilijana Sutic ("Debtors") hereby move this Court for a determination of the secured value of Debtors' real property located at 2490 Quail Creek Place, Escondido, California pursuant to 11 U.S.C. §§506(a) and 1325(a)(5)(B) and *In re Lam (Lam vs. Investors Thrift)*, 211 B.R. 36 (9th Cir. BAP 1997), to stay post petition payments; to treat the claim of Villa Capital as to the second Deed of Trust, as wholly unsecured for purposes of plan confirmation; to declare that the lien recorded in favor of Villa Capital, as to the second Deed of Trust, is 100% unsecured and therefore Villa Capital's claim, as to the second Deed of Trust, is not entitled to treatment under Debtors' proposed Chapter 13 plan as a secured claim; and on further grounds set forth in the Memorandum of Points and Authorities and Declaration of Support, filed concurrently herewith, and on such further grounds as may be presented in oral arguments before this Court or upon Reply to any opposition filed in response to this Motion.

This motion is based upon the following:

Debtors filed for relief under Chapter 13 of the United States Bankruptcy Code on August 17, 2009. Their Amended Chapter 13 Plan ("Plan") proposes monthly payments of $91.87 for sixty months and 5% to their general unsecured creditors. Debtors' Property, based upon an appraisal as of August 20, 2009, is valued at $415,000.00. Debtors' petition lists two (2) deeds of trust on the property. The first Deed of Trust, held by Chase, is for approximately $635,000.00. The second Deed of Trust, held by Villa Capital, Inc. is for $42,851.81. The amount on the first Deed of Trust exceeds the value of Debtors' Property and leaves Villa Capital's claim, as to the second Deed of Trust, wholly unsecured.

///
///
///

Debtors respectfully request this Court consider Villa Capital's claim, as to the second Deed of Trust, as unsecured for purposes of the instant case and to stay post petition payments to Villa Capital as to the second Deed of Trust, and for other such relief as is requested in the instant Motion.


Dated: November 2, 2009                    POTTER HANDY, LLP

                                           By:    /s/ Mark D. Potter
                                                  Mark D. Potter
                                                  Attorney for Debtor

_____

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  STATEMENT OF FACTS

Mario Sutic and Lilijana Sutic ("Debtors") filed for relief under Chapter 13 of the United States Bankruptcy Code on August 17, 2009.  Debtors' Schedule A lists Debtors' principal place of residence located at 2490 Quail Creek Place, Escondido, California ("Property") (see a true and correct copy of Debtors' "Schedule A" attached hereto as "Exhibit 1").  The following liens currently encumber the Property: a first Deed of Trust in favor of Chase, a second Deed of Trust held by Villa Capital (see a true and correct copy of Debtors' "Schedule D" attached hereto as "Exhibit 2.")

Chase holds the first Deed of Trust on the Property and the current balance of the encumbrance is $677,579.32 (see a true and correct copy of the Proof of Claim filed by JP Morgan Chase Bank, National Association, attached hereto as "Exhibit 3").  The second Deed of Trust, held by Villa Capital, is in the amount of $42,851.81 (see a true and correct copy of Villa Capital's Home Equity Revolving Credit Line Statement as to the second mortgage, dated August 4, 2006, attached hereto as "Exhibit 4").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Debtors' Property, based upon a August 20, 2009 appraisal, is valued at $415,000.00 (see a true and correct copy of a declaration of John K. Cherrington, a licensed real estate appraiser, attached hereto as "Exhibit 5" and a true and correct copy of an appraisal report prepared by John K. Cherrington attached hereto as "Exhibit 6"). The encumbrance of the first Deed of Trust exceeds the fair market value of the Property leaving Villa Capital's claim, as to the second Deed of Trust, wholly unsecured.

## II. DISCUSSION

The issue before the Court is whether a second mortgagee's "secured claim" on a piece of real property may be treated as an unsecured claim when the value of the second mortgagee's claim completely exceeds the value of the real property *after* satisfaction of the first mortgagee's claims. Pursuant to Bankruptcy Code Sections 506(a)(1) and 1322(b)(2) and current case law, the wholly unsecured second Deed of Trust on Debtors' property should be considered an unsecured interest and the lien should be extinguished upon discharge.

Villa Capital's claim, as to the second Deed of Trust, is unsecured pursuant Bankruptcy Code 11 U.S.C. Section 506(a)(1) which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property… and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The Court in <u>In re Plouffe</u>, 157 B.R. 198 (Bankr. D. Conn. 1993), held that for a mortgagee to claim the protection against modification granted by Section 1322(b)(2), the mortgagee must qualify as the holder of a secured claim to some extent as

determined by Section 506(a).  The Court rationalized that "there is neither a logical nor rational basis for a creditor holding a completely unsecured claim to be protected from claim modification in a bankruptcy case simply because the creditor had obtained a lien on the homestead pre-petition."  <u>Id</u>. at 200.

When section 506(a)(1) is applied to claims such as mortgages, a mortgage would not be a "secured claim" to the extent that it exceeds the value of the property on which it has a security.  In <u>Zimmer v. PSB Lending Corp. (In re Zimmer)</u>, 313 F.3d 1220, 1223 (9th Cir. 2002), the Court stated that the term "secured claim" is a term of art, and a claim secured by a lien on property is not necessarily a "secured claim" and may be modified and avoided.  "Under the Bankruptcy Code, 'secured claim' is thus a term of art; not every claim that is secured by a lien on property will be considered a "secured claim." (<u>Zimmer</u> at 1223).

Bankruptcy Code 11 U.S.C. Section 1322(b)(2) which states that a Chapter 13 plan may

> ... modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the Debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

The policy behind section 1322(b)(2) indicates that Congress intended to distinguish between secured and unsecured claims, rather than secured and unsecured creditors.  The Debtors in the instant case seek to modify Villa Capital's claim, as to the second Deed of Trust, by having the claim declared an unsecured claim and the lien determined to be unsecured.  Villa Capital's claim is unsecured since no security interest attaches to their second lien.  Villa Capital, as to the second Deed of Trust, would be entitled to the protection of Section 1322(b)(2) only if after satisfaction of the first mortgage it retained some security in the property.  In the instant case, there is no such security because the value of Debtors' Property is $415,000.00 and the first Deed of Trust alone encumbers the Property in the amount of $677,579.32.  Villa

Capital's claim, as to the second Deed of Trust is completely unsecured after satisfaction of Debtors' first mortgage.

The Court in In Re Hornes, 160 B.R. 709 (Bankr. D. Conn. 1993), explained that the code does not generally classify creditors based on the existence of a piece of paper purporting to give a creditor rights in specified collateral, but rather on whether a creditor actually holds a claim supported by valuably estate property. Id. at 715. In the instant case, Villa Capital's claim, as to the second Deed of Trust, is not secured by any collateral or valuable estate as the lien is unsecured and does not succeed at attaching the property. Therefore, the second Deed of Trust is unsecured and the claim of Villa Capital, as to the second Deed of Trust, should be treated as unsecured for purposes of the Chapter 13 plan, thus allowing the voiding the lien upon discharge.

In Nobelman vs. American Savings Bank, 508 U.S. 324 (S. Ct. 1993), the Supreme Court of the United States held that section 1322(b)(2), which bars a Chapter 13 plan from modifying the rights of holders of claims secured partially by the Debtors' principal place of residence, does not apply to holders of totally unsecured claims. Protecting wholly unsecured lien holders under section 1322(b)(2) is contrary to the provisions of the Bankruptcy Code and unsecured claims may be discharged. Therefore, Villa Capital's claim, as to the second Deed of Trust, may be treated as wholly unsecured and discharged upon completion of the plan.

In the seminal case, Lam v. Investors Thrift (In re Lam), 211 B.R. 36, Bankr. (B.A.P. 9th Cir. 1997), the Debtors filed a Chapter 13 case on November 17, 1994. In their schedules they listed their place of residence, which had an undisputed fair market value of $300,000. The property was encumbered by four (4) trust deeds. The first Deed of Trust, in the amount of $164,222, was completely secured. The second Deed of Trust, in the amount of $61,924, was also completely secured. The third Deed of Trust, in the amount of $560,000, was partially secured and therefore

not subject to modification under the code.  Thrift's fourth Deed of Trust, in the amount of $17,193, was completely unsecured and therefore the Appellate Court ruled that Thrift's claim be discharged. Likewise, Villa Capital's claim, as to the second Deed of Trust, is also completely unsecured and the lien should be declared void upon discharge pursuant to In re Lam.

## III.  CONCLUSION

Based upon the foregoing, Villa Capital's lien, as to the second Deed of Trust, is unsecured and should be treated as an unsecured claim.  The value of the Debtors' Property is less than the amount owed to the first mortgagee. In a liquidation context, the second mortgagee would not receive any funds.  Therefore, under section 506(a), Villa Capital's claim, as to the second Deed of Trust, should be treated as an unsecured claim for purposes of plan treatment and Villa Capital's unsecured lien on the Debtors' Property should be voided upon discharge.

WHEREFORE, based on the foregoing, the Debtors respectfully request:

1. That the Court value the real property located at 2490 Quail Creek Place, Escondido, California at $415,000.00;

2. That the Court deem the lien of Villa Capital, as to the second Deed of Trust, as an unsecured claim during the life of the Debtors' chapter 13 plan;

3. That the Court stay post petition payments to Villa Capital, as to the second Deed of Trust;

4. That upon completion of all plan payments and entry of discharge in this case pursuant to 11 U.S.C. Section 1328, the lien held by Villa Capital, as to the second Deed of Trust,  will be void and will not constitute an encumbrance on the real property described in the motion;

5.     That upon completion of the plan payments and upon entry of discharge in this case, Villa Capital, is ordered to expeditiously reconvey the second Deed of Trust and otherwise take such steps required to clear title of said lien as to the real property described in this motion;

6.     That should the case the dismissed or converted to any other chapter prior to completion of the plan and entry of a chapter 13 discharge, the lien will remain valid;

7.     For any other such relief the Court deems proper.

Dated: November 2, 2009               POTTER HANDY, LLP

By:   /s/ Mark D. Potter
       Mark D. Potter
       Attorney for Debtor

## LEGAL DESCRIPTION

## EXHIBIT A

Parcel 1:

Lot(s) 43 of Escondido Tract No. 706R-L, in the City of Escondido, County of San Diego, State of California, according to the map thereof No. 13287, filed in the office of the County Recorder of San Diego County on January 22, 1996.

EXCEPT therefrom all oil, oil rights, minerals, mineral rights, natural gas, natural gas rights, and other hydrocarbons by whatsoever name known that may be within or under said land, together with the perpetual right of drilling, mining, exploring and operating therefore and removing the same from said land or any other land, including the right to whipstock or directionally drill and mine from lands other that said land, oil or gas wells, tunnels and shafts into, through or across the subsurface of said land, and to bottom such whipstocked or directionally drilled wells, tunnels and shaft under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines, without however, the right to drill, mine, explore and operate through the surface or the upper 500 feet of the subsurface of said land or otherwise in such manner as to endanger the safety of any highway that may be constructed on said lands.

Parcel 2:

A non-exclusive easement for ingress, egress and access on, over and across the "Main Collector Streets" as shown on the recorded map of Escondido Tract No. 706R-A, and on, over and across the other private streets as shown on the recorded map of Escondido Tract No. 706 R-L, as more particularly set forth in that certain "Declaration Establishing Access Easement Rights" recorded on May 10, 1996 as Document No. 1996-0239531 of Official Records as same may be amended from time to time, (the "Access Easement Declaration").

Parcel 3:

Non-exclusive easements for ingress, egress, access, maintenance, repairs, drainage, encroachment, support, use, enjoyment and for all purposes as described in the Master Declaration, Notice of Annexation and Access Easement Declaration.

Parcel ID Number: 241-220-43
2490 Quail Creek Place
Escondido
("Property Address"):

which currently has the address of
[Street]
[City], California 92027    [Zip Code]

B6A (Official Form 6A) (12/07)

.

In re    **Mario Sutic,**                                                     Case No. __**09-12234-13**__
         **Ljiljana Sutic**

_____,
                              Debtors

# SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G   Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim." If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C   Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband, Wife, Joint, or Community | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| **Location: 2490 Quail Creek Place, Escondido CA** | **Fee simple** | **C** | **446,500.00** | **677,651.81** |

|  |  | Sub Total > | **446,500.00** | (Total of this page) |
|---|---|---|---|---|
|  |  | Total > | **446,500.00** |  |

__**0**__    continuation sheets attached to the Schedule of Real Property

(Report also on Summary of Schedules)

Copyright (c) 1996-2009 - Best Case Solutions - Evanston, IL - (800) 492-8037

Best Case Bankruptcy

EXHIBIT 1

B6D (Official Form 6D) (12/07)

In re  **Mario Sutic,**
       **Ljiljana Sutic**

Case No. ___**09-12234-13**___

Debtors

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐  Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
| | | H | W J | C | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Account No. **xxxxxx6140**<br><br>**Chase**<br>**PO Box 78148**<br>**Phoenix, AZ 85062** | | | | C | **2006**<br><br>**First Mortgage**<br><br>**Location: 2490 Quail Creek Place, Escondido CA** | | | | | |
| | | | | | Value $              **446,500.00** | | | | **634,800.00** | **188,300.00** |
| Account No. **1248SUTIC**<br><br>**Villa Capital, Inc.**<br>**1780 Town and Country Drive**<br>**#105**<br>**Norco, CA 92860** | | | | C | **August 15, 2006**<br><br>**Second Mortgage**<br><br>**Location: 2490 Quail Creek Place, Escondido CA** | | | X | | |
| | | | | | Value $              **446,500.00** | | | | **42,851.81** | **42,851.81** |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |
| Account No. | | | | | | | | | | |
| | | | | | Value $ | | | | | |

**0**    continuation sheets attached

| | | |
|---|---|---|
| Subtotal<br>(Total of this page) | **677,651.81** | **231,151.81** |
| Total<br>(Report on Summary of Schedules) | **677,651.81** | **231,151.81** |

Copyright (c) 1996-2009 - Best Case Solutions - Evanston, IL - (800) 492-8037

Best Case Bankruptcy

EXHIBIT 2

**B10 (Official Form 10)**

| UNITED STATES BANKRUPTCY COURT, | SOUTHERN | DISTRICT OF | FORNIA (San Diego) | PROOF OF CLAIM |
|---|---|---|---|---|

| Name of Debtor | MARIO SUTIC LJILJANA SUTIC | Case Number: 09-12234-LA13 |
|---|---|---|

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money of property):<br>JP MORGAN CHASE BANK, NATIONAL ASSOCIATION | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notics should be sent:<br>JP MORGAN CHASE BANK, NATIONAL ASSOCIATION<br>7255 BAY MEADOWS WAY<br>JACKSONVILLE, FL 32256<br>Telephone number: (949) 252-9400 | **Court Claim Number:** _____<br> *(If known)*<br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check box in you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** $677,579.32<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim:<br><br>☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).<br><br>☐ Wages, salaries, or commissions (up to $10,950), * earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4). |
| **2. Basis for Claim:** Money loaned | |
| **3. Last four digits of any number by which creditor identifies** XXXX6140<br><br>   **3a. Debtor may have scheduled account as:** _____ | ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5). |
| **4. Secured Claim**<br>   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>   **Nature of property or right of setoff:** ☑ Real Estate  ☐ Motor Vehicle  ☐ Other<br><br>   **Value of Property:** _____  **Annual Interest Rate** _____<br><br>   **Amount of arrearage and other charges as of time case filed included in secured claim,**<br>   **if any:** $48,721.99  **Basis for perfection:** _____<br><br>   **Amount of Secured Claim:** $677,579.32  **Amount Unsecured:** _____ | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507 (a)(8).<br><br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507 (a)(__). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary.<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$ _____<br><br>*Amount are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after |

| | | |
|---|---|---|
| Date:<br>*October 15, 2009* | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | **FOR COURT USE ONLY** |
| */s/William G. Malcolm* | William G. Malcolm     JP Morgan Chase Bank, National Association | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B10

C:\BCP\PDFExport\42280.Sutic.l.poc.pdf

**EXHIBIT 3**

**Exhibit "1"**

| | |
|---|---:|
| Payment Total: | $ 44,993.25 |
| Late charge Total: | $ 0.00 |
| Other charges Total: | $ 3,728.74 |
| **Arrears Total:** | **$ 48,721.99** |

**Exhibit "1"**

**Pre-Petition Arrears:**

9 payments due at $ 4,999.25 each     $ 44,993.25
(December/2008 to August/2009)

**Exhibit "1" continue**

| | |
|---|---|
| **Other charges total:** | **$3,728.74** |

**Other Charges:**

| | |
|---|---|
| Property Inspection | $ 92.90 |
| NSF Fees | $ 50.00 |
| Accrued Late Charges | $ 1,088.00 |
| BPO Fee | $ 100.00 |
| Attorney FCL Costs | $ 1,897.84 |
| Attorney FCL Fees | $ 500.00 |

I am employed by the law firm of MALCOLM & CISNEROS in the county of Orange, State of California. I am over the age of 18 and not a party to the within action.  My business address is 2112 Business Center Drive, Second Floor, Irvine, California 92612.

On  October 15, 2009           , I caused to be served the document entitled:

**PROOF OF CLAIM**

**on the following interested parties :**

| | |
|---|---|
| **Debtor(s) :**<br><br>Mario  Sutic<br>2490 Quail Creek Place<br>Escondido , CA 92027<br><br>Ljiljana  Sutic<br>2490 Quail Creek Place<br>Escondido , CA 92027 | **Debtors' Attorney:**<br><br>Potter Handy, LLP<br>Mark D. Potter<br>100 East San Marcos Blvd, Suite 400<br>San Marcos , CA 92069 |

**Chapter 13 Trustee:**

David L Skelton
525 B Street Suite 1430
San Diego , CA 92101-4507

[X]   (By Mail) I caused each envelope, with postage prepaid, to be placed  in the United States mail at Irvine California.

[ ]   (By Hand) I caused each envelope to be delivered by hand

[ ]   (By Overnight Courier) I caused each envelope, with postage prepaid, to be sent by Federal Express /Express Mail.

[ ]   (By Facsimile Transmission) I caused each document to be sent by automatic facsimile transmission to the following telephone numbers and confirmed by voice communication that the transmission was received :

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court  at whose direction service was made an that the forgoing is true an correct and this declaration was executed on the date indicated below at Irvine, California.

**DATED :**   October 15, 2009

*/s/Catherine Luong*

CATHERINE LUONG

C:\BCP\PDFExport\42280.Sutic.cl.poc.pdf

ATTN: NANCY

Recording Requested By:
Washington Mutual Bank

Return To:
2210 Enterprise Drive
Doc Ops - MS SC00140
Florence, SC 29501

Prepared By:
Michelle Morgan

--------[Space Above This Line For Recording Data]--------

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 29, 2006
together with all Riders to this document.
(B) "Borrower" is Mario Sutic And Ljiljana Sutic, Husband And Wife as joint tenants

Borrower's address is 2490 Quail Creek Place, Escondido, CA 92027
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is Washington Mutual Bank

Lender is a federal association
organized and existing under the laws of the United States

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01

-6(CA) (0207)
Page 1 of 16                   Initials MS &S
VMP MORTGAGE FORMS - (800)521-7291

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL.

BY CAMEO ESCROW CORP

Lender's address is 1400 South Douglass Road, Suite 100, Anaheim, CA 92806

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is WMB

(E) "Note" means the promissory note signed by Borrower and dated June 29, 2006
The Note states that Borrower owes Lender
No/100 ........................................................................... Dollars
(U.S. $............... ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than August 1, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

[X] Adjustable Rate Rider   [ ] Condominium Rider         [ ] Second Home Rider
[ ] Balloon Rider           [X] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider     [ ] Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

WMB -6(CA) (0407)          Page 2 of 16                  Form 3005 1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL
BY CAMEO ESCROW CORP.

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County _____ of SAN DIEGO _____ :

[Type of Recording Jurisdiction]       [Name of Recording Jurisdiction]

SEE ATTACHED

Parcel ID Number:                                    which currently has the address of
2490 Quail Creek Place                                                              [Street]
Escondido                                    [City], California   92027        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(OA) (0307)                          Page 0 of 15          Initials _____      Form 3005  1/01

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL.

BY: CAMEO ESCROW CORP

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL

BY CAMEO ESCROW CORP

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6(OA) (0207)    Page 5 of 15    Form 3005 1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

BY CAMEO ESCROW CORP

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6(CA) (0207)                    Page 5 of 15                                  Form 3005 1/01

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL

BY CAMEO ESCROW CORP

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL

BY: CAMEO ESCROW CORP

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6(CA) (0207)                    Page 8 of 19                    Form 3006 1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

BY CAMEO ESCROW CORP

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL.

BY: CAMEO ESCROW CORP

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6(CA) (0207)                    Page 10 of 18                    Initials _____    Form 3008 1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL.

BY CAMEO ESCROW CORP

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

.-6(CA) (0207)                     Page 11 of 15                     Form 3005  1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL.

BY: CAMEO ESCROW CORP

JUL-06-2006 THU 09:48 AM CAMEO ESCROW          FAX NO. 714 2243480          P. 14

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6(CA) (0307)          Page 13 of 16          Form 3005  1/01

THE HEREIN IS CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL.

BY: CAMEO ESCROW CORP

JUL-06-2006 THU 09:48 AM CAMEO ESCROW          FAX NO. 714 2243480          P. 15

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL

BY CAMEO ESCROW CORP.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                   Mario Sutic                  -Borrower

_____          _____ (Seal)
                                   Ljiljana Sutic               -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                                       -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                                       -Borrower

_____ (Seal)   _____ (Seal)
                -Borrower                                       -Borrower

-6(CA) (0407)                 Page 14 of 16                    Form 3005   1/01

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL.
_____
BY  CAMEO ESCROW CORP

State of California
County of SAN DIEGO                    } ss.

On  JUNE 29, 2006          before me, S. CANASA, NOTARY PUBLIC, personally appeared

MARIO SUTTL AND LILJANA SUTTL

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

S. CANASA
Commission # 1564957
Notary Public - California
Orange County
My Comm. Expires Nov 24, 2008

-8(CA) (0307)          Page 19 of 18          Form 3005  1/01

THE HEREIN IS CERTIFIED TO BE
A TRUE AND CORRECT COPY OF
THE ORIGINAL

BY: CAMEO ESCROW CORP

# FIXED/ADJUSTABLE RATE RIDER

THIS FIXED/ADJUSTABLE RATE RIDER is made on this 29th    day of June                    ,
2006         and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to  Long Beach Mortgage Company

("Lender") of the same date and covering the property described in the Security Instrument and located at:
2490 Quail Creek Place, Escondido, CA 92027

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE FROM THE
INITIAL FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR
CHANGES IN THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of               8.900 %. The Note provides for a
change in the initial fixed interest rate to an adjustable interest rate and for changes in the monthly payments, as
follows:

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay may change on the first day of August            ,2008
and on that day every  6th          month thereafter. Each date on which my interest rate could change is called a
"Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average
of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as
published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the
Change Date is called the "Current Index." If the Index is no longer available, the Note Holder will choose a new
Index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Four and 99/100
percentage point(s) (        4.990 %) to the Current Index. The Note Holder will then round the result of this
addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D)
below, this rounded amount will be the new interest rate until the next Change Date.

I HEREBY CERTIFY THIS
TO BE AN EXACT TRUE COPY
OF THE ORIGINAL
SIGNED

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     10.900 % or less than     8.900 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One     percentage points (     1.000 %) from the rate of interest I have been paying for the preceding 6   months. My interest rate will never be greater than  14.900 % or less than  8.900 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 18 of the Security Instrument provides as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 18 of the Security Instrument shall then cease to be in effect, and Section 18 of the Security Instrument shall instead provide as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

CALIFORNIA FIXED ADJUSTABLE RATE RIDER - LIBOR

4140613 (0508)     Page 2 of 3

I HEREBY CERTIFY THIS TO BE AN EXACT TRUE COPY OF THE ORIGINAL SIGNED

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

| | | |
|---|---|---|
| _Mario Sutic_ _____ (Seal) | _S. Sutic_ _____ (Seal) |
| Mario Sutic                -Borrower | Liljana Sutic              -Borrower |
| _____ (Seal) | _____ (Seal) |
|                            -Borrower |                            -Borrower |
| _____ (Seal) | _____ (Seal) |
|                            -Borrower |                            -Borrower |
| _____ (Seal) | _____ (Seal) |
|                            -Borrower |                            -Borrower |

[Sign Original Only]

I HEREBY CERTIFY THIS TO BE AN EXACT TRUE COPY OF THE ORIGINAL SIGNED _____

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 29th              day of
June, 2006                     , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to Long Beach Mortgage Company, 1400 South Douglass
Road,  Suite 100, Anaheim, CA 92806

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at: 2490 Quail Creek Place, Escondido, CA 92027

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
SEE ATTACHED

(the "Declaration"). The Property is a part of a planned unit development known as
Rancho San Pasqual

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners
Association; and (iii) any by-laws or other rules or regulations of the Owners Association.
Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
Page 1 of 3                    Initials: _____
-7R (0411)        VMP Mortgage Solutions, Inc. (800)521-7291

I HEREBY CERTIFY THIS
TO BE AN EXACT TRUE COPY
OF THE ORIGINAL
SIGNED

B. **Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

-7R (0411)        Page 2 of 3        Form 3150 1/01

I HEREBY CERTIFY THIS TO BE AN EXACT TRUE COPY OF THE ORIGINAL
SIGNED _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
Mario Sutic          -Borrower          Ljiljana Sutic          -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                               -Borrower

                                              0729326140

-7R (0411)              Page 3 of 3              Form 3150 1/01

I HEREBY CERTIFY THIS
TO BE AN EXACT TRUE COPY
OF THE ORIGINAL
SIGNED _____

# OCCUPANCY AGREEMENT

DATE: June 29, 2006
BORROWER:

Mario Sutic
Ljiljana Sutic

LOAN #: ~~~~~~~~~
PROPERTY ADDRESS: 2490 Quail Creek Place

Escondido, CA 92027

The undersigned Borrower(s) of the above captioned property understand that one of the conditions of the loan is that Borrower(s) occupy the subject property and Borrower(s) do hereby certify as follows:

1. Borrower intends to occupy the property as Borrower's primary residence.

2. Borrower intends to occupy the property during the 12 month period immediately following the loan closing as the primary residence of the Borrower (i.e., the property will be "owner occupied").

3. If Borrower's intention changes prior to the loan closing, Borrower agrees to notify Lender immediately of that fact.

4. Borrower understands that Lender may not make the loan in connection with subject property without this Occupancy Agreement.

5. Borrower acknowledges Lender has relied upon the Borrower's representation of occupancy in securing said loan, the interest rate or funding said loan.

**THE UNDERSIGNED BORROWER(S) ACKNOWLEDGES AND AGREES THAT:**

1. **ANY MISREPRESENTATION OF OCCUPANCY BY BORROWER(S);**

2. **BORROWER(S) FAILURE TO OCCUPY THE PROPERTY AS THE PRIMARY RESIDENCE (i.e. OWNER-OCCUPIED) DURING THE 12 MONTH PERIOD FOLLOWING THE LOAN CLOSING;**

**SHALL CONSTITUTE A DEFAULT UNDER THE NOTE AND SECURITY INSTRUMENT EXECUTED IN CONNECTION WITH SAID LOAN AND, UPON THE OCCURRENCE OF SAID DEFAULT, THE WHOLE SUM OF PRINCIPAL AND INTEREST PAYABLE PURSUANT TO SAID NOTE PLUS COSTS AND FEES SHALL BECOME IMMEDIATELY DUE AT THE OPTION OF THE HOLDER THEREOF AND/OR LENDER MAY ADJUST THE INTEREST RATE TO BE EQUIVALENT TO THAT OF A NON-OWNER OCCUPIED LOAN.**

Borrower(s) understand that it is a Federal Crime punishable by fine or imprisonment or both to knowingly make any false statement concerning any of the above facts, as applicable under the provisions of Title 18 U.S.C., Sec. 1014.

I declare that the foregoing Agreement is true and correct and agree to said terms of Agreement allowing Lender discretion to call loan due and/or adjust the interest rate based upon any misrepresentation of occupancy.

| | | | |
|---|---|---|---|
| Borrower Mario Sutic | 6-29-06 | Borrower | Date |
| | Date | | |
| Borrower Ljiljana Sutic | 6/29/06 | Borrower | Date |
| | Date | | |

VMP-599 (9910)          VMP MORTGAGE FORMS - (800)521-7291          8/90

**Important Terms of Our**
**Home Equity Revolving Credit Line**

This disclosure contains important information about the Home Equity Revolving Credit Line offered by **Villa Capital, Inc..** You should read it carefully and keep a copy for your records.

**Availability of Terms.** None of the terms below are subject to change if you submit an application within 60 days of receiving this statement. If any of these terms change and you decide, as a result, not to enter into an agreement with us, you are entitled to a refund of any fees that you paid to anyone else in connection with your Application.

**Security Interest.** We will take a mortgage (deed of trust) on your home (subject property). You could lose your home if you do not meet the obligations in your agreement with us.

**Possible Actions.** We can terminate your line, require you to pay us the entire balance due in one payment, and charge you certain fees if: (i) you do not meet the repayment terms or (ii) your action or inaction adversely affects the collateral or our rights in the collateral. We can refuse to make additional extensions of credit if: (i) the value of your home securing the line declines significantly below its appraised value for purposes of the line, (ii) we reasonably believe you will not be able to meet the repayment requirements due to a material change in your financial circumstances or (iii) you are in default of a material obligation in this agreement or any other obligation secured by and/or associated with the subject property.

**Advance Period; Minimum Payment.** For **36** months, you can obtain advances of credit on your credit line up to your credit limit (the "draw period"). During the draw period, payments will be due monthly and will equal the finance charges that accrued on the outstanding balance during the previous month. After the draw period, you will no longer be able to obtain credit advances and must repay the outstanding balance over **48** months with a balloon payment at the end of the **84th** month (the "repayment period"). Your minimum payment will be interest only for **83** months followed by a balloon payment.

**Minimum Payment Example.** If you made only the minimum payment on the payment due date each month during the draw period and the repayment period and took no other credit advances, it would take **84** months to pay off a credit advance of $10,000. During that period, at an **ANNUAL PERCENTAGE RATE of 15.99%**, you would make 83 payments of $133.25 followed by 1 payment of $10,133.25.

**Account Opening Fees or Charges.** To open an Account you will have to pay the following initial fees to us:

| Description | Amount | Description | Amount |
|---|---|---|---|
| Title Insurance (estimated) | $100.00 | Escrow Fees (estimated) | $375.00 |
| Recording Fees (estimated) | $60.00 | Loan Fee-paid from Initial Cash Advance (cash loan) | $3,700.00 |
| Appraisal Fee | $0.00 | Other | $2,267.66 |

There are no annual fees on this account, but you will pay a cash advance fee of **$100.00** of the new advances of credit after the initial advance. You also must pay certain fees to third parties to open a line. These fees generally total between $1,000 to $2,000. If you ask, we will give you an itemization of the fees you will have to pay third parties.

**Minimum and Maximum Draw Requirements.** The initial advance of credit can be up to but not exceeding **$28,000.00**. The initial advance and any advances of credit requested during the first 30 days of your account cannot exceed **80.0%** of your credit limit. Subsequent advances of credit must be **$1,000.00** or larger.

**Tax Consequences.** You should consult a tax advisor about the deductibility of interest and other charges for the line.

**Annual Percentage Rate.** The interest rate on the account is fixed at **15.99% ANNUAL PERCENTAGE RATE.** The **ANNUAL PERCENTAGE RATE** includes interest but not other costs.

Acknowledged and Agreed: **COPY**
**FOR YOUR RECORDS**

Mario Sutic:_____    Date:_____

Ljiljana Sutic:_____    Date:_____

# HOME EQUITY CREDIT LINE REVOLVING LOAN AGREEMENT

This is an agreement containing the terms and disclosures which apply to your home equity line of credit account ("Account") with **Villa Capital, Inc..** The words "we" or "us" refer to the lender named in the previous sentence. The words "'you" or "your" mean the person or persons who use or authorize the use of the Account, jointly and severally.

**1. How You May Use Your Account**. You can borrow money ("Cash Loans") from your Account by making a written request to us up to your maximum credit limit. Your Account is a revolving line of credit. You cannot request money in excess of the available credit (the difference between your outstanding balance and your maximum credit limit) on your Account. You may not request less than **$1,000.00** at any one time. Requests for money must be in writing sent to us at an address we will give you. We will respond to us within 5 business days after receipt of your request. For the first **30** days after your Account is open, you will not be permitted to draw more than **80.0%** of your initial credit limit. You cannot make more than one draw request per 30 day period.

**2. Maximum Credit Limit**. Your initial credit limit is **$35,000.00**, of which your first Cash Loan can be up to but not exceeding **$28,000.00**. You agree that we can change your credit limit at any time but it shall never exceed **$42,000.00**. You also agree that we are not obligated to extend credit to you for an amount that would make your outstanding balance exceed your maximum credit limit or for any amount if your outstanding balance is already over the maximum credit limit. Any increases in your maximum credit limit you request will require that you make a written application for our approval. You will pay any amounts that exceed your maximum credit limit upon demand. We may re-evaluate your financial condition if you request a higher credit limit, or at any other time, and this may include obtaining a current credit bureau report, and/or asking you for current financial information. We may suspend your right to obtain additional Cash Loans when: (i) the value of your home has declined more than 20% from the appraised value at the time the Account was opened, (ii) we reasonably believe that you will be unable to fulfill your repayment obligations under this Agreement because of a material adverse change in your financial circumstances, (iii) you file a bankruptcy petition, (iv) one of the Account holders requests such suspension or (v) governmental or court action. If you believe that one of the conditions is no longer present, we will reinstate your ability to obtain Cash Loans if you so request in writing and we confirm that the condition is no longer present.

**3. Monthly Statement**. If you have an outstanding debit or credit New Balance of $1.00 or more, or if there is any finance charge imposed during a billing cycle, we will send you a statement. You agree to pay us for all Cash Loans, fees and charges, if any, and FINANCE CHARGES on your Account, all payable in United States Dollars according to the terms and conditions of this Agreement.

**4. FINANCE CHARGE on Your Account Balance**. We will determine and impose a FINANCE CHARGE by applying a daily periodic rate of **0.044%** to the daily unpaid principal balance for the number of days that balance remains unpaid in the billing cycle. The daily periodic rate is the **ANNUAL PERCENTAGE RATE of 15.99%** divided by 365. To get the daily unpaid principal balance we will take the beginning balance each day, add any new debits or Cash Loans and subtract any payments or credits. The ANNUAL PERCENTAGE RATE does not include costs described in this Agreement other than interest. A portion of the FINANCE CHARGE will be figured by applying a cash advance fee (a transaction fee) of **$100.00** to each Cash Loan after the first Cash Loan, on the date the new Cash Loan is posted to your Account. Finance charges accrue on a new Cash Advance and the related cash advance fee as soon as the Cash Advance is made. Amounts we must pay to protect the security of our Deed of Trust will earn finance charges at the ANNUAL PERCENTAGE RATE applicable during default as soon as we make the advance.

**5. Minimum Payment**. You agree to pay either the entire outstanding balance ("New Balance") indicated on your monthly statement or in monthly payments. During the period you are permitted to obtain new Cash Loans ("Draw Period"), the minimum monthly payment ("Minimum Payment Due") you must pay will be equal to just the unpaid finance charges that have accrued during the billing cycle, without any provision for reduction of the unpaid principal balance. You can always pay more if you wish. At the end of the Draw Period and continuing until you have paid the unpaid principal balance in full, your Minimum Payment Due will be fixed at an amount equal to interest only for **48** equal monthly payments followed by a balloon payment of all unpaid principal. If you default and we must advance other sums to protect the security of our Deed of Trust, you agree to pay these amounts in full together with the next regularly scheduled Minimum Payment Due.

**6. Fees.**

(a) *Late Payment Fee*: Your Minimum Payment Due will be past due if it is not received by us on or before the Payment Due Date shown on each monthly statement. A late charge of **10.0%** of the payment with a minimum of **$15.00** will be charged to your Account, if at least the Minimum Payment Due, including unpaid payments, is not received by us within **10** days after the Payment Due Date.

(b) *Fee for Documents*: If you request a copy of a statement, Cash Loan request or other document not in connection with a billing error, we will charge your Account the sum of $15.00 for each copy.

(c) *Annual or Initial Fees*: You agree to pay, by a debit to your Account, the following initial, non-refundable fees to set up this Account:

| Description | Amount | Description | Amount |
|---|---|---|---|
| Title Insurance (estimated) | $100.00 | Escrow Fees (estimated) | $375.00 |
| Recording Fees (estimated) | $60.00 | Loan Fee- paid from Initial Cash Advance (cash loan) | $3,700.00 |
| Appraisal Fee | $0.00 | Other | $2,267.66 |

**COPY**
**FOR YOUR RECORDS**

You agree to pay the exact amount of any initial fee that is estimated. There are no annual fees on this account, but you will pay a cash advance fee for new Cash Loans.

(d) *Returned Payment Check Fee*: If you make payment by check and a check is returned unpaid for any reason, your Account will be charged **$50.00** for each returned check.

**7. Draw and Repayment Periods.** You may add Cash Loans to your Account for up to **36** months so long as you own your home and you are not in default ("Draw Period"). Thereafter ("Repayment Period"), you must pay at least the Minimum Payment until the Unpaid Balance is paid in full or the maturity date of **08/15/2013**, whichever occurs first. On written notice to you we can extend your Draw Period or your Repayment Period, but we are not obligated to do so.

**8. Application of Payment.** We will determine the method of applying your payments and credits to your Account.

**9. Security.** All of your obligations under this Agreement are secured by a deed of trust ("Deed of Trust") on your home located at **2490 Quail Creek Place Escondido CA 92027.**

You may buy property insurance from anyone that is acceptable to us. You will provide proof you are insured under the policy. The Deed of Trust allows us to declare a default if you sell or transfer your home without our prior written consent (you are the "Trustor," we are the "Beneficiary," and the "Property" is your home in the following quotation):

*TRANSFER: If Trustor voluntarily sells or conveys the above-described Property, fully or partially, or any interest in it or, by some act or means divest themselves of title to the Property without obtaining the written consent of Beneficiary, Trustor shall be in default and Beneficiary may, at its option, declare the entire unpaid balance of the loan and accrued but unpaid interest immediately due and payable.*

**10. Events of Default.** You will be in default under this Agreement if any of the following events occurs: (a) if you fail to comply with the Minimum Payment or any other terms or conditions of this Agreement; (b) if you die and you are the only Account holder or if an Account holder survives you, we deem the security for the Account adversely affected; (c) you sell or transfer your home; (d) if you fail to maintain the insurance required by the Deed of Trust; (e) if a lien senior to our Deed of Trust on your home forecloses; (f) if your home is taken by eminent domain; (g) if you commit waste or otherwise destructively use or fail to maintain your home such that the action adversely affects the security of our Deed of Trust; (h) if you use your home illegally and such use subjects your home to seizure by governmental authorities; (i) if you move out of your home and your non-occupancy adversely affects the security for the Account; and (j) you fail to pay property taxes and other assessment liens on your home that are senior to the Deed of Trust.

**11. Entire Balance Due.** If you are in default, we may do one or more of the following: (i) require that you immediately pay the outstanding balance with interest due on this balance, at the **ANNUAL PERCENTAGE RATE** provided above, until paid, (ii) we can terminate your right to obtain additional Cash Loans or (ii) we can raise your **ANNUAL PERCENTAGE RATE** to **19.00%** during the period you are in default. We may exercise one of these options without giving up our right to exercise another option if your default continues. If we demand full payment of the outstanding balance and you fail to immediately make payment, you agree to pay all collection costs, including our attorney's fees.

**12. Transfer of Account.** You cannot transfer or assign your Account to any other person.

**13. Notice to Joint Applicants.** Each applicant has the right to use this Account to the extent of the Maximum Credit Limit and may be liable for all amounts extended under this Account to any joint applicant.

**14. Change of Address.** You agree to advise us promptly if you change your mailing address. All written notices and statements from us to you will be considered given when placed in the United States mail, postage prepaid, and addressed to you at your current address as it appears in our records.

**15. Irregular Payments.** We may accept late payments or partial payments or checks, drafts or money orders marked "Payment in Full" without losing any of our rights under this Agreement.

**16. Amendments.** We may make insignificant changes to this Agreement at any time or changes that unquestionably benefit you, as long as we give you advance written notice as required by law.

**17. Cancellation.** You can cancel your account at any time by giving us notice and paying in full all sums due on your Account. Your obligation under this Agreement, including our security interest in your home, and any changes made under this Agreement prior to cancellation will continue to apply until you have paid you all the money you owe on the Account.

**18. Other Provisions.** Each of you who signed this Agreement or use the Account is individually and jointly obligated for all payments due under this Agreement. The Account has been applied for, considered, approved and issued in the State of California and all extensions of credit are being made from the State of California. You agree that this Agreement shall be governed by and interpreted under California and Federal law. If any part of this agreement is not valid, all other parts will remain enforceable.

**19. Tax Consequences.** You should consult a tax advisor about the deductibility of interest and other charges under this Agreement.

*SEE FOLLOWING PAGE FOR ADDITIONAL PROVISIONS, IMPORTANT INFORMATION AND SIGNATURES*

### YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors or Questions about Your Bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write to us on a separate sheet at the address listed the bill. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information.

- Your full name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us by three business days before the automatic payment is scheduled to occur.

**Your Rights and Your Responsibilities after We Receive Your Written Notice.**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. We must tell anyone we report to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**20. California Notice.** California law requires that we notify you that if you fail to fulfill the terms of your credit obligation, a negative credit report reflecting your credit record may be submitted to a credit reporting agency.

By signing below, you agree to all of the above terms and conditions and certify that you have received a completed copy of this Agreement and two copies of a Notice of Right to Cancel this Agreement on the date shown below.


Borrower  *Mario Sutic*                          Date    Borrower  *Ljiljana Sutic*                        Date


*CFL lenders check below:*

[X]   FOR INFORMATION CONTACT THE DEPARMENT OF CORPORATIONS, STATE OF
        CALIFORNIA

**Home Equity Revolving Credit Line**
**Customer Declaration of Suitability of Revolving Credit**

TO: Villa Capital, Inc.

Each of us that initial and sign below declare under penalty of perjury under the laws of the State of California:
*Initial to the left only if you are certain each statement is completely true:*

_____ I intend to use the revolving line of credit by paying the balance down and re-drawing money as the need arises.

_____ I understand that a loan without a revolving feature may be more suitable to me if I have no intention of ever using the pay down and redraw features of the revolving credit line.

_____ I understand that a non-revolving loan may cost me less money both in fees to obtain the loan and interest that is charged on the loan.

_____ If I obtain this loan, the lender will have a mortgage on my home. I could lose my home, and any money I have put into it, if I do not meet my obligations under the loan.

_____ I understand that mortgage loan rates and closing costs and fees vary based on many factors, including my particular credit and financial circumstances, my earnings history, the loan-to-value requested, and the type of property that will secure a loan. Higher rates and fees may be justified depending on the individual circumstances of a particular consumer's application. I know I should shop around and compare loan rates and fees.

_____ This revolving line of credit may have a higher rate and total points and fees than other mortgage loans. I will consider consulting a qualified independent credit counselor or other experienced financial adviser regarding the rate, fees, and provisions of this mortgage loan before I proceed. If I want information or want to contact a qualified credit counselor, I call the United States Department of Housing and Urban Development's counseling hotline at 1-888-466-3487 or go to www.hud.gov/fha/sfh/hcc for a list of counselors.

_____ I am not required to complete any loan agreement merely because the lender has received this statement or I have signed a loan application.

_____ If I proceed with this mortgage loan, I will remember that I could face serious financial risks if I use this loan to pay off credit card debts and other debts in connection with this transaction and then subsequently incur significant new credit card charges or other debts. If I continue to accumulate debt after this loan is closed and then experience financial difficulties, I could lose my property and any equity I have in it if I do not meet my mortgage loan obligations.

_____ My payments on existing debts contribute to my credit ratings. I will ignore any advice to ignore my regular payments to my existing creditors.

_____ **I understand that any disputes with the Lender or anyone who owns the loan, and their personnel, will be subject to binding arbitration under a separate agreement. I freely agree to binding arbitration.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| Borrower | *Mario Sutic* | Date | Borrower | *Ljiljana Sutic* | Date |
|---|---|---|---|---|---|

## YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors or Questions about Your Bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write to us on a separate sheet at the address listed the bill. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information.

- Your full name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us by three business days before the automatic payment is scheduled to occur.

**Your Rights and Your Responsibilities after We Receive Your Written Notice.**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. We must tell anyone we report to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Home Equity Revolving Credit Line**
**Customer Income Declaration**

TO: Villa Capital, Inc.

Each of us that initial and sign below declare under penalty of perjury under the laws of the State of California:
*Initial to the left only if you are <u>certain</u> each statement is <u>completely</u> true:*

_____    I have stated to the Lender that my and my spouse's income (if married) is $ __20,000.00__ per
month.

_____    I represent to the Lender again that this income figure is accurate.

_____    I have no reason to believe that my/our income will decrease during the life of the credit line.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| Borrower | *Mario Sutic* | Date | Borrower | *Ljiljana Sutic* | Date |
|---|---|---|---|---|---|

# NOTICE OF RIGHT TO CANCEL
**(Opening an Account)**

**1. Your Right to Cancel**

We have agreed to establish an open-end credit account for you, and you have agreed to give us a lien (security interest) on your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

1.  the opening date of your account which is **August 4, 2006**; or
2.  the date you received your Truth-in-Lending disclosures; or
3.  the date you received this notice of your right to cancel the account.

If you cancel the account, the lien on your home is also canceled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the lien on your home has been canceled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2. How to Cancel**

If you decide to cancel the account, you may do so by notifying us in writing, at

**Villa Capital, Inc. c/o
Villa Capital, Inc.
2152 Dupont Drive, Suite 104
Irvine CA 92612**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **August 8, 2006** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL.

_____

Consumer's Signature                                          Date

CONSUMER acknowledges receipt of two (2) copies each of this Notice

| | | |
|---|---|---|
| Consumer | *Mario Sutic* | Date |

# NOTICE OF RIGHT TO CANCEL
**(Opening an Account)**

**1. Your Right to Cancel**

We have agreed to establish an open-end credit account for you, and you have agreed to give us a lien (security interest) on your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

1. the opening date of your account which is **August 4, 2006**; or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel the account.

If you cancel the account, the lien on your home is also canceled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the lien on your home has been canceled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2. How to Cancel**

If you decide to cancel the account, you may do so by notifying us in writing, at

**Villa Capital, Inc. c/o**
**Villa Capital, Inc.**
**2152 Dupont Drive, Suite 104**
**Irvine CA 92612**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **August 8, 2006** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL.

_____
Consumer's Signature                                          Date

CONSUMER acknowledges receipt of two (2) copies each of this Notice

_____
Consumer    *Mario Sutic*                                    Date

# NOTICE OF RIGHT TO CANCEL
(Opening an Account)

## 1. Your Right to Cancel

We have agreed to establish an open-end credit account for you, and you have agreed to give us a lien (security interest) on your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

1. the opening date of your account which is **August 4, 2006**; or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel the account.

If you cancel the account, the lien on your home is also canceled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the lien on your home has been canceled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## 2. How to Cancel

If you decide to cancel the account, you may do so by notifying us in writing, at

**Villa Capital, Inc. c/o**
**Villa Capital, Inc.**
**2152 Dupont Drive, Suite 104**
**Irvine CA 92612**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **August 8, 2006** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL.

_____
Consumer's Signature                                    Date

CONSUMER acknowledges receipt of two (2) copies each of this Notice

_____
Consumer      *Ljiljana Sutic*                          Date

# NOTICE OF RIGHT TO CANCEL
**(Opening an Account)**

## 1. Your Right to Cancel

We have agreed to establish an open-end credit account for you, and you have agreed to give us a lien (security interest) on your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

1. the opening date of your account which is **August 4, 2006**; or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel the account.

If you cancel the account, the lien on your home is also canceled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the lien on your home has been canceled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## 2. How to Cancel

If you decide to cancel the account, you may do so by notifying us in writing, at

**Villa Capital, Inc. c/o**
**Villa Capital, Inc.**
**2152 Dupont Drive, Suite 104**
**Irvine CA 92612**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of **August 8, 2006** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL.

_____
Consumer's Signature                          Date

CONSUMER acknowledges receipt of two (2) copies each of this Notice

c

_____
Consumer     *Ljiljana Sutic*                Date

# LOAN PROGRAM OPTIONS

Subject to lender's approval of your loan application, you have a choice of two loan programs:

## Option One:  Home Equity Line of Credit

| | |
|---|---|
| Maximum Draw Amount: | $35,000.00   (including closing costs) |
| Maximum Initial Draw: | $28,000.00 |
| Unused Credit | $7,000.00 |
| Points: | $3,700.00 paid from initial credit limit |
| Points that can be financed | 100% (no cash deposit by borrower) |
| Loan Term: | 7 years, 3 years of which is the draw period, balloon after 7 years |
| Interest Rate: | 15.99    % fixed |
| Payments: | Interest only monthly |

## Option Two: Conventional Closed-End Loan (With or Without Prepay Penalty)

(The prepayment penalty is 6 months' interest on all but 20% of loan amount that you prepay in any 12 month period during the first 3 years of the loan)

| | Loan With Prepay Penalty | Loan W/O Prepay Penalty |
|---|---|---|
| Maximum Loan Amount: | $35,000.00 | $35,000.00 |
| Interest Rate (fixed) | 15.99% | 15.99% |
| Loan Term | 84 months | 84 months |
| Loan Origination Fee | $3,700.00 | $3,700.00 |
| Other Closing Costs (est) | $2,802.66 | $2,802.66 |
| Payments | Interest only | Interest only |
| Closing Costs Financed | Up to 5.5% of loan amount | Up to 5.5% of loan amount |
| Cash Borrower Must Deposit | $4,577.66 | $4,577.66 |

Our choice:   [ ]   Home Equity Line
              [ ]   Conventional Closed-End Loan With Prepayment Penalty
              [ ]   Conventional Closed-End Loan Without Prepayment Penalty

We each acknowledge receipt of a copy of this Notice on the dates indicated beside our signatures.

_____          _____
Mario Sutic                    Date    Ljiljana Sutic              Date

**Villa Capital, Inc., A California Corporation. CFL License No. 603A276**
**2152 Dupont Drive, Suite 104, Irvine, California 92612**

## PROCESSING AND DISBURSEMENT INSTRUCTIONS

**BORROWER(S) NAME(S) ("I," "me" or "my"): Mario Sutic and Ljiljana Sutic**

**LOAN NO.: SUTIC1248**

**PROPERTY ADDRESS ("Property"): 2490 Quail Creek Place, Escondido, CA 92027**

To Villa Capital, Inc.

     I have signed a promissory note/ loan agreement and deed of trust/mortgage or other security instrument for a loan of **$35,000.00** from you to be secured by the Property (the "Loan").

Conditions to Funding. I understand that while you have agreed to make the Loan, your agreement and funding are contingent upon: (1) verification of all material information I have provided to you, (2) insurance of my Loan by a title company insuring that the security instrument for the Loan will be in    2nd position when recorded, subject to a  1st priority deeds of trust upon which is owed about **$594,000.00** and other items of record which do not affect the value or marketability of the Loan; (3) confirmation that my real property taxes are current and that I have sufficient fire and/or flood insurance on the Property in force to protect the Loan; (4) there has been no material change in my financial situation or the Property; and (5) [x] other conditions are attached.  If these conditions are not met, you may cancel the Loan without liability to me.  When the conditions have been met, you will record the security instrument and make the disbursements indicated in the next paragraph.

Disbursement of Loan Proceeds. When the Conditions to Funding have been met, I hereby authorize you to disburse the net proceeds of the Loan to me, after paying you and the other payees as indicated on the Itemization of Amount Financed/Good Faith Estimate of Closing Costs I am signing with these Instructions.  I understand the amounts to be paid (other than expenses of this Loan to be paid to you) may change as updated figures become available. You are hereby authorized to pay the exact amount due any payee listed in the Itemization/Good Faith Estimate.  You may use a payment coupon, statement, my representation or other information to determine the amount to be paid to others.  You are hereby authorized to pay from the proceeds of the Loan any payment taxes, bonds, liens or other items necessary to insure the priority for the Loan as indicated in the previous paragraph even if those items are not listed on the Itemization/Good Faith Estimate.  If the loan proceeds are insufficient to pay all payees I have authorized to be paid above, I agree to contribute the difference before the closing.  You may cancel any checks not cashed within 60 days of issuance and apply the same to the balance on my loan.

Miscellaneous. A change in these instructions requires my signature and that of your representative.  You may write to me at the Property, unless I give a new address in writing.  I ACKNOWLEDGE THAT YOU ARE THE LENDER IN THIS TRANSACTION, AND ARE NOT MY AGENT, ADVISOR, REPRESENTATIVE OR FIDUCIARY.

_____ is the name of any other mortgage broker I have used in this transaction.
$_____ is the fee I have agreed to pay the other mortgage broker.

We give these Instructions to you and hereby acknowledge receipt of a copy of these Instructions.


_____         _____
Mario Sutic         Date        Ljiljana Sutic         Date

**Villa Capital, Inc., A California Corporation. CFL License No. 603A276**
**2152 Dupont Drive, Suite 104, Irvine, California 92612**

## Confirmation of Receipt

By my/our signature(s) below, I/we do hereby confirm that I/we have been given the following:

1. The 11 page Booklet issued by The Federal Reserve Board entitled 'What You Should Know About Home Equity Lines of Credit'.

_____     _____     _____     _____
Mario Sutic                 Date         Ljiljana Sutic               Date

Recording Requested By
LSI. Fidelity National Financial

When Recorded Mail To
Villa Capital, Inc.
2152 Dupont Drive, Suite 104
Irvine, CA  92612

**COPY
FOR YOUR RECORDS**

Loan No. Sutic1248
Title Order No. 2655662

Space above this line for recorder's use

## LONG FORM DEED OF TRUST AND ASSIGNMENT OF RENTS FOR
## HOME EQUITY REVOLVING LINE OF CREDIT

**THIS DEED OF TRUST** made this 3rd day of August, 2006 between **Mario Sutic and Ljiljana Sutic, Husband and Wife as Joint Tenants**, herein called **TRUSTOR** whose address is 2490 Quail Creek Place Escondido CA 92027, **LSI. Fidelity National Financial Company**, a California corporation, herein called **TRUSTEE** and Villa Capital, Inc., A California Corporation, CFL #603 A276 whose address is 2152 Dupont Drive, Suite 104 Irvine CA 92612, herein called **BENEFICIARY**.

**Witnesseth,** That TRUSTOR IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS to TRUSTEE IN TRUST, WITH POWER OF SALE that property in San Diego County, California described as (the "Property"):
**Legal Description attached hereto as Exhibit 'A'.**

TOGETHER WITH the rents, issues and profits thereof, SUBJECT HOWEVER, to the right, power and authority given to and conferred upon Beneficiary in Paragraph 10 below to collect and apply such rents, issues and profits.

FOR THE PURPOSE OF SECURING:
    (A)    Performance of each agreement of Trustor contained in this Deed of Trust.
    (B)    Payment of the indebtedness evidenced by a Home Equity Credit Line Revolving Loan Agreement (hereinafter referred to as "AGREEMENT") of even date herewith in the initial principal amount of **$35,000.00**, but subject to increase to a maximum of **$42,000.00**, executed by Trustor in favor of Beneficiary or order, and any extension or renewal thereof. The AGREEMENT is a revolving line of credit enabling the Trustor to redraw sums previously repaid, to be secured hereby, pursuant to the terms of the AGREEMENT and this Deed of Trust.
STATEMENT OF OBLIGATION: Beneficiary may collect the then maximum fee provided by Section 2943 of the California Civil Code for furnishing a statement of obligation.
TRANSFER: If Trustor voluntarily sells or conveys the above-described Property, fully or partially, or any interest in it or, by some act or means divest themselves of title to the Property without obtaining the written consent of Beneficiary, Trustor shall be in default and Beneficiary may, at its option, declare the entire unpaid balance of the loan and accrued but unpaid interest immediately due and payable.
**TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR ALSO AGREES:**
    (1) To keep the Property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting said Property or requiring any alteration or improvement to be made thereon; not to commit or permit waste thereon; not to commit, suffer or permit any act upon said Property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said Property may be reasonably necessary, the specific enumeration herein not excluding the general.
    (2) To provide, maintain and deliver to Beneficiary fire insurance satisfactory to it and with loss payable to Beneficiary. The amount collected under any first or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary, the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.
    (3) To appear in and defend any action or proceeding purporting to alter the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including costs of evidence of title and attorney's fees in a reasonable sum in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to enforce this Deed of Trust.
    (4) To pay at least ten days before delinquency all taxes and assessments affecting said Property, including assessments on appurtenant water stock, when due, all encumbrances, charges and liens, with interest, on said Property or any part thereof, which appear to be prior to or superior hereto; and all costs, fees and expenses of this Trust. Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said Property for such purpose, appear in and defend any action or proceeding purport to affect the security hereof or the rights or powers of Beneficiary or Trustor, pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be proper or superior hereto, and in exercising any such power, pay necessary expenses, employ counsel and pay his reasonable fees.
    (5) To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with finance charges from date of expenditure at the applicable Annual Percentage Rate in the AGREEMENT, and to pay for any statement provided by laws in effect at the date hereof regarding the obligation secured hereby any amount demanded by Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.
    (6) That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.
    (7) That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.
    (8) That any time and from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust and said AGREEMENT for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said Property; consent to the making of any map or plat thereof; join in granting any easement thereon or join in any extension agreement or any agreement subordinating the lien or charge hereof.
    (9) That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust and said AGREEMENT to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held hereunder. The recitals in such reconveyance of any matters of fact shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as, "the person or persons legally entitled thereto." Five years after issuance of such full reconveyance, Trustee may destroy said AGREEMENT and the Deed of Trust unless directed in such request to retain them.
    (10) That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said Property, reserving unto Trustor the right, prior to any default by Trustor in payment of any

indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person or by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said Property or any part hereof, in his own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including attorney's fees upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said Property, the collection of such rents, issues and profits and the application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(11) That upon default by Trustor under the AGREEMENT, Beneficiary may declare all sums secured hereby immediately due and payable by delivering to Trustee a written declaration of default and demand for sale and a written notice of default and election to cause to be sold said Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the AGREEMENT and all documents evidencing expenditures secured herein. After the lapse of such time as may then be required by law following recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand upon Trustor, shall sell the Property at the time and place fixed by or in said notice of sale, either as a whole or as a separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of Sale. Trustee may postpone sale of all or any portion of said Property by public announcement at the time fixed by the preceding postponement. Trustor shall deliver to such purchaser its deed conveying the Property, but without covenant or warranty, express or implied. The recitals in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary, as hereinafter defined, may purchase at such sale. After deducting all costs, fees and expenses of Trustor and of this Trust, including costs of evidence of title in connection with sale, Trustor shall apply the proceeds of sale to payment of all sums expended under the terms hereof, not then repaid, with accrued finance charges at the applicable Annual Percentage Rate in the AGREEMENT; all other sums then secured thereby; and the remainder, if any, to the person or persons legally entitled thereto.

(12) Beneficiary or any successor in ownership of any indebtedness secured hereby, may from time to time, in an instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instruments executed by Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Such instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page when this Deed of Trust is recorded and the name and address of the new Trustee.

(13) That this Deed of Trust applies to, inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary means the owner and holder, including pledgees, of the AGREEMENT secured hereby, whether or not named as Beneficiary herein. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and or neuter, and the singular number includes the plural.

(14) That Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereof of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

(15) If this Deed of Trust is secured by condominium, community apartment, stock cooperative leasehold or planned unit development, Trustor agrees to comply with all recorded declaration of covenants, conditions and restrictions, association bylaws, and association rules and regulations, and, upon written request from Beneficiary, to enforce the same as against other owners in such developments.

(16) If the Deed of Trust is secured by a lease, Trustor agrees not to amend, change, modify or waive his or her interest therein, or agree to do so or to breach the lease without the written consent of Beneficiary. If this covenant is breached and the security for this Deed of Trust is materially and adversely affected, Beneficiary shall have the option to declare all sums owed under the AGREEMENT and this Deed of Trust, immediately due and payable in full.

**TRUSTOR REQUESTS THAT A COPY OF ANY NOTICE OF DEFAULT AND OF ANY NOTICE OF SALE BE MAILED TO TRUSTOR AT TRUSTOR'S ADDRESS SET FORTH ON THE FRONT OF THIS DEED OF TRUST.**

IN ACCORDANCE WITH SECTION 2924b OF THE CALIFORNIA CIVIL CODE, REQUEST IS HEREBY MADE BY THE TRUSTOR THAT A COPY OF ANY NOTICE OF DEFAULT AND A COPY OF ANY NOTICE OF SALE UNDER DEED OF TRUST RECORDED ON
_____, _____, in Book _____, Page _____    Official Records of _____ County (or filed for record with
Recorder's Serial Number _____ of same County), California affecting the Property described on the front of this instrument
executed by _____ as Trustor in which _____ is named as
Beneficiary, and _____ as Trustee, be mailed to _____ at
_____

**SIGNATURES OF TRUSTOR(S):**

| Borrower | Mario Sutic | Date | Borrower | Liljana Sutic | Date |
|---|---|---|---|---|---|

STATE OF CALIFORNIA )
) ss.
COUNTY OF _____ )

On _____, 200____ before me, _____, notary public,
personally appeared _____ personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary Public

1 | POTTER HANDY, LLP
MARK D. POTTER, ESQ., SBN 166317
2 | RUSSELL C. HANDY, ESQ., SBN 195058
100 East San Marcos Blvd., Suite 400
3 | San Marcos, CA 92069-2988
(760) 480-4162; Fax (760) 480-4170
4 | mark@potterhandy.com

5 | Attorney for Debtors

6

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10

11

12 | **In re:**                                ) Case No.: 09-12234-13
                                             )
13 | **Mario and Ljiljana Sutic**            ) Chapter 13
                                             )
14 |                                          ) **DECLARATION OF JOHN K.**
                                             ) **CHERRINGTON**
15 |            Debtors.                       )
                                             )
16 |                                          )
                                             )
17 |                                          )
                                             )
18 |                                          )
                                             )
19 |                                          )
                                             )
20 |                                          )

21 |     **1.** I, the undersigned, am a certified and accredited residential appraiser in

22 | California and was retained to provide an appraisal of the current market value of the

23 | residential property located at 2490 Quail Creek Place, Escondido, CA 92027. I can

24 | competently testify to the following based upon my own knowledge and experience.

25 |     **2.** I personally appraised the property known as APN: 241-220-43, Lot(s) 43 of

26 | Escondido Tract No. 706R-L, according to the map thereof No. 13287 located at 2490

27 | Quail Creek Place, Escondido, CA 92027, located within San Diego County.

28

Motion To Determine Value            1

EXHIBIT 5

1

2      **3.** I authored the appraisal report that is attached to this declaration and
3  incorporate each of my findings and factual statements into this declaration.

4      **4.** Based upon my appraisal and the facts and conditions outlined in the attached
5  report, I find that the current market value of the subject property is currently $415,000.

6      I declare under penalty of perjury under the laws of the State of California and
7  the United States that the foregoing is true and correct.

8

9  Dated: Sept 15, 2009       By: _____

10                                 **JOHN K. CHERRINGTON**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion To Determine Value                2

Marston Residential Appraisal Group, Inc.

File No. 70892

APPRAISAL OF



LOCATED AT:

2490 Quail Creek Place
Escondido, CA  92027

FOR:

Mario Sutic
2490 Quail Creek Place
Escondido, CA 92027

BORROWER:

Mario Sutic

AS OF:

August 20, 2009

BY:

John K Cherrington

EXHIBIT 6

Marston Residential Appraisal Group, Inc.

08/20/2009

Mario Sutic
2490 Quail Creek Place
Escondido, CA  92027

File Number:  70892

In accordance with your request, I have appraised the real property at:

2490 Quail Creek Place
Escondido, CA  92027

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   August 20, 2009                          is:

$415,000
Four Hundred Fifteen Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

John K Cherrington

## Uniform Residential Appraisal Report

File No. 70892

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

### SUBJECT

| | |
|---|---|
| Property Address 2490 Quail Creek Place | City Escondido | State CA | Zip Code 92027 |

Borrower Mario Sutic — Owner of Public Record Sutic — County San Diego

Legal Description Escondido Tct #706R-L Lot 43 Map 13287

Assessor's Parcel # 241-220-43 — Tax Year 2009 — R.E. Taxes $ 5,736.00

Neighborhood Name Rancho San Pasqual — Map Reference 1130-H4 — Census Tract 0207.09

Occupant [X] Owner [ ] Tenant [ ] Vacant — Special Assessments $ 600.00 — [X] PUD — HOA $ 145.00 [ ] per year [X] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Value Estimation

Lender/Client Mario Sutic — Address 2490 Quail Creek Place, Escondido, CA 92027

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). MLS-Multiple Listing Service-San Diego

### CONTRACT

I [ ] did [X] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.
N/A

Contract Price $ Market Value — Date of Contract N/A — Is the property seller the owner of public record? [X] Yes [ ] No — Data Source(s) Metroscan

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No
If Yes, report the total dollar amount and describe the items to be paid.     N/A          N/A

### NEIGHBORHOOD

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | Property Values [ ] Increasing [ ] Stable [X] Declining | | | PRICE | AGE | One-Unit | 70% % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | Demand/Supply [ ] Shortage [ ] In Balance [X] Over Supply | | | $(000) | (yrs) | 2-4 Unit | 5% % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 350 Low | 0 | Multi-Family | 10% % |
| Neighborhood Boundaries See Attached Addendum. | | | | | 1000+ High | 60 | Commercial | 10% % |
| | | | | | 500 Pred. | 20 | Other Vacant | 5% % |

Neighborhood Description See Attached Addendum.

Market Conditions (including support for the above conclusions) See Attached Addendum.

### SITE

Dimensions See Plat Map — Area 7854 Sq.Ft. — Shape Rectangular — View None

Specific Zoning Classification R-1, SFR — Zoning Description Single Family Residential

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved or as proposed per plans and specifications the present use? [X] Yes [ ] No  If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | | [X] |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley None | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No — FEMA Flood Zone X — FEMA Map # 060284 1082 F — FEMA Map Date 06/19/1997

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No  If Yes, describe. See Attached Addendum.

### IMPROVEMENTS

| GENERAL DESCRIPTION | FOUNDATION | EXTERIOR DESCRIPTION materials/condition | INTERIOR materials/condition |
|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [X] Concrete Slab [ ] Crawl Space | Foundation Walls Concrete/Good | Floors Wd,Crpt,Tile/Gd |
| # of Stories 1 | [ ] Full Basement [ ] Partial Basement | Exterior Walls Stucco/Good | Walls Drywall/Gd |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area sq. ft. | Roof Surface Tile/Good | Trim/Finish Wd/Painted/Gd |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish N/A % | Gutters & Downspouts Yes/Good | Bath Floor Tile,Crpt/Gd |
| Design (Style) 1Sty/Conv/Good | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type Vinyl Slider/Good | Bath Wainscot Prefab/Gd |
| Year Built 1998 - 11 Years | Evidence of [ ] Infestation | Storm Sash/Insulated None,Yes/Good | Car Storage [ ] None |
| Effective Age (Yrs) 5 Years | [ ] Dampness [ ] Settlement | Screens Yes/Good | [X] Driveway # of Cars 2 |
| Attic [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities | Driveway Surface Concrete |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel Gas | [X] Fireplace(s) # 1 [X] Fence Block | [X] Garage # of Cars 2 |
| [ ] Floor [ ] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck Conc [X] Porch Conc | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Pool [ ] Other | [ ] Att. [ ] Det. [ ] Built-in |
| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [ ] Washer/Dryer [ ] Other (describe) | | | |

Finished area above grade contains: 6 Rooms — 3 Bedrooms — 2.00 Bath(s) — 1,782 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) See Attached Addendum.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.) See Attached Addendum.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No  If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No  If No, describe.

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

There are **11** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ **378,900** to $ **699,000** .

There are **32** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ **360,000** to $ **715,000** .

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | +(-) $ Adjustment | COMPARABLE SALE NO. 2 | +(-) $ Adjustment | COMPARABLE SALE NO. 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 2490 Quail Creek Place Escondido | 3132 Olive Knoll Place Escondido, CA 92027 | | 3119 Olive Knoll Place Escondido, CA 92027 | | 2440 Fallbrook Place Escondido, CA 92027 | |
| Proximity to Subject | | 0.34 miles N | | 0.33 miles N | | 0.27 miles NW | |
| Sale Price | $ Market Value | $ 430,000 | | $ 415,000 | | $ 415,272 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 229.21 sq. ft. | | $ 269.83 sq. ft. | | $ 237.57 sq. ft. | |
| Data Source(s) | Inspection | Metroscan Doc#2009-Title | | Metroscan Doc#2009-379988 | | Metroscan Doc#2009-357183 | |
| Verification Source(s) | Metroscan/Owner | Metroscan/MLS/Title | | Metroscan/MLS/Title | | Metroscan/MLS/Title | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | Conventional None Noted | Conventional Days on mkt 47 | | Conventional Days on mkt 6 | | Conventional Days on mkt 9 | |
| Date of Sale/Time | N/A | 08/17/2009 | | 07/10/2009 | | 06/30/2009 | |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 7854 Sq.Ft. | 7933 Sq.Ft. | | 6450 Sq.Ft. | | 5722 Sq.Ft. | |
| View | No View | No View | | No View | | Sup. View | -10,000 |
| Design (Style) | 1Sty/Conv/Good | 2Sty/Conv/Good | | 1Sty/Conv/Good | | 1Sty/Conv/Good | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 1998 - 11 Years | 1998 - 11 Yrs. | | 1997 - 12 Yrs. | | 1998 - 11 Yrs. | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total 6 Bdrms. 3 Baths 2.00 | Total 7 Bdrms. 4 Baths 2.00 | | Total 6 Bdrms. 3 Baths 2.00 | | Total 6 Bdrms. 3 Baths 2.00 | |
| Room Count | 45.00 | | | | | | |
| Gross Living Area | 1,782 sq. ft. | 1,876 sq. ft. | -4,230 | 1,538 sq. ft. | 10,980 | 1,748 sq. ft. | 1,530 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Good | Superior | -7,500 | Superior | -7,500 | Superior | -7,500 |
| Heating/Cooling | Fau/Central A/C | Fau/Central A/C | | Fau/Central A/C | | Fau/Central A/C | |
| Energy Efficient Items | None Known | None Known | | None Known | | None Known | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 3 Car Garage | -5,000 | 2 Car Garage | |
| Porch/Patio/Deck | Patio,Porch | Patio | | Patio | | Patio,Porch | |
| Landscape | Gd. Landscape | Gd. Landscape | | Gd. Landscape | | Gd. Landscape | |
| Pool | None | None | | None | | None | |
| Net Adjustment (Total) | | ☐+ ☒- $ 11,730 | | ☐+ ☒- $ 1,520 | | ☐+ ☒- $ 15,970 | |
| Adjusted Sale Price of Comparables | | Net Adj. -2.7% Gross Adj. 2.7% $ 418,270 | | Net Adj. -0.4% Gross Adj. 5.7% $ 413,480 | | Net Adj. -3.8% Gross Adj. 4.6% $ 399,302 | |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s) Realist/Metroscan

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s) Realist/Metroscan

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/19/2003 | 09/29/1997 | 10/21/2001 | 03/14/2003 |
| Price of Prior Sale/Transfer | $435,000 | $221,000 | $300,000 | $385,000 |
| Data Source(s) | Realist/Metroscan | Realist/Metroscan | Realist/Metroscan | Realist/Metroscan |
| Effective Date of Data Source(s) | 08/20/2009 | 08/20/2009 | 08/20/2009 | 08/20/2009 |

Analysis of prior sale or transfer history of the subject property and comparable sales **See Attached Addendum.**

Summary of Sales Comparison Approach. **See Attached Addendum**

Indicated Value by Sales Comparison Approach $ 415,000

Indicated Value by: Sales Comparison Approach $ **415,000**   Cost Approach (if developed) $ **478,600**   Income Approach (if developed) $ **N/A**

"The Intended User of the appraisal report is he Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for private investment purposes, subject to the stated Scope of Work, purpose of this appraisal, reporting requirements of this appraisal report form and Definition of Market Value. No additional Intended Users are identified by the appraiser."

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: **See Attached Addendum.**

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ **415,000**

as of **08/20/2009** , which is the date of inspection and the effective date of this appraisal.

MARSTON RESIDENTIAL APPRAISAL GROUP

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

**ADDITIONAL COMMENTS**

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value) __The appraiser has utilized the abstraction and sales comparison method and has reviewed comparables sales of similar land use in approximating value.__

| | | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE . . . . . . . . . . . . . . . . . . . . . = $ | 225,000 |
| Source of cost data **Local Builders/Suppliers** | Dwelling | 1,782 Sq. Ft. @ $ | 125.00 . . . . . . . . . . = $ | 222,750 |
| Quality rating from cost service **Good** | Effective date of cost data **09/2008** | | Sq. Ft. @ $ | . . . . . . . . . . . . . = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | **Patio,Porch** | | 15,000 |
| The estimated site value was determined by the abstraction | Garage/Carport **380** | Sq. Ft. @ $ | 40.00 . . . . . . . . . . = $ | 15,200 |
| method.  Physical depreciation was determined by the age/life | Total Estimate of Cost-New | . . . . . . . . . . . . . = $ | 252,950 |
| method.  In San Diego County the land/improvement ratio often | Less | 60 | Physical | Functional | External | |
| exceeds 35% of the total valuation.  Cost estimates were | Depreciation | $39,390 | | | = $ ( | 39,390) |
| determined from Marshall & Swift- a Cost estimating service.  See | Depreciated Cost of Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = $ | 213,560 |
| Attached sketch addendum. | "As-is" Value of Site Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . = $ | 40,000 |
| Estimated Remaining Economic Life (HUD and VA only) | 55 Years | INDICATED VALUE BY COST APPROACH . . . . . . . . . . . . . . . . . . . . . = $ | 478,600 |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

| | | | | |
|---|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | **N/A** = $ | **N/A** Indicated Value by Income Approach | |
| Summary of Income Approach (including support for market rent and GRM) | | | | |

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No   Unit type(s) ☒ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project **Rancho San Pasqual**

| | | | |
|---|---|---|---|
| Total number of phases | Total number of units | Total number of units sold | |
| Total number of units rented | Total number of units for sale | Data source(s) | |
| Was the project created by the conversion of an existing building(s) into a PUD? ☐ Yes ☐ No | If Yes, date of conversion. | | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No | Data source(s) | | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No | If No, describe the status of completion. | | |

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.  **Common Areas, Pool,Spa, Clubhouse, playgrounds,Gated entrance**

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.    The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.    The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.    The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.    The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.    The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.    The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.  I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported  he condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.  I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.  I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.  I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.  I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.  I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.  I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.  I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.  I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or opinion of market value in  his appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of  he properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report.  If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.  Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations.  Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1.   I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and  he appraiser's certifica ion.

2.   I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.   The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.   This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.   If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if  a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *John K Cherrington* | Signature _____ |
| Name John K Cherrington | Name _____ |
| Company Name Marston Residential Appraisal Group | Company Name _____ |
| Company Address 1525 S. Escondido Blvd, #E | Company Address _____ |
| Escondido, CA 92025 | _____ |
| Telephone Number 760 737-8400 | Telephone Number _____ |
| Email Address _____ | Email Address _____ |
| Date of Signature and Report 08/20/2009 | Date of Signature _____ |
| Effective Date of Appraisal 08/20/2009 | State Certification # _____ |
| State Certification # AR 034497 | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe)              State # _____ | Expiration Date of Certification or License _____ |
| State CA | |
| Expiration Date of Cer ification or License 07/01/2010 | |

ADDRESS OF PROPERTY APPRAISED
2490 Quail Creek Place
Escondido, CA  92027

APPRAISED VALUE OF SUBJECT PROPERTY $ 415,000

LENDER/CLIENT
Name _____
Company Name Mario Sutic
Company Address 2490 Quail Creek Place
Escondido, CA 92027
Email Address _____

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
Date of Inspection _____
☐ Did inspect interior and exterior of subject property
Date of Inspection _____

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
Date of Inspection _____

MARSTON RESIDENTIAL APPRAISAL GROUP

Marston Residential Appraisal Group Inc.

## Uniform Residential Appraisal Report

File No. 70892

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 2490 Quail Creek Place<br>Escondido | 3128 Ferncreek Lane<br>Escondido, CA 92027 | | | | | |
| Proximity to Subject | | 0.20 miles NNE | | | | | |
| Sale Price | $ Market Value | $ 460,000 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 212.08 sq. ft. | | $ sq. ft. | | $ 0.00 sq. ft. | |
| Data Source(s) | Inspection | Pending Listing | | | | | |
| Verification Source(s) | Metroscan/Owner | Metroscan/MLS/Title | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | Conventional | Conventional | | | | | |
| Concessions | None Noted | Days on mkt 15 | | | | | |
| Date of Sale/Time | N/A | 08/08/2009 LD | | | | | |
| Location | Suburban | Suburban | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 7854 Sq.Ft. | 8474 Sq.Ft. | | | | | |
| View | No View | No View | | | | | |
| Design (Style) | 1Sty/Conv/Good | 1Sty/Conv/Good | | | | | |
| Quality of Construction | Good | Good | | | | | |
| Actual Age | 1998 - 11 Years | 1998 - 11 Yrs. | | | | | |
| Condition | Good | Good | | | | | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 6 / 3 / 2.00 | 6 / 3 / 2.00 | | | | | |
| Gross Living Area | 45.00    1,782 sq. ft. | 2,169 sq. ft. | -17,415 | sq. ft. | | sq. ft. | |
| Basement & Finished | None | None | | | | | |
| Rooms Below Grade | None | None | | | | | |
| Functional Utility | Good | Superior | -7,500 | | | | |
| Heating/Cooling | Fau/Central A/C | Fau/Central A/C | | | | | |
| Energy Efficient Items | None Known | None Known | | | | | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | | | | |
| Porch/Patio/Deck | Patio,Porch | Patio,Porch | | | | | |
| Landscape | Gd. Landscape | Gd. Landscape | | | | | |
| Pool | None | Pool | -20,000 | | | | |
| | | 1 Fireplace | | | | | |
| Net Adjustment (Total) | | ☐+ ☒- $ | 44,915 | ☒+ ☐- $ | 0 | ☒+ ☐- $ | 0 |
| Adjusted Sale Price | | Net Adj. -9.8% | | Net Adj. 0.0% | | Net Adj. 0.0% | |
| of Comparables | | Gross Adj. 9.8% $ | 415,085 | Gross Adj. 0.0% $ | 0 | Gross Adj. 0.0% $ | 0 |

| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | COMPARABLE SALE NO. 5 | COMPARABLE SALE NO. 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 11/19/2003 | 06/29/2000 | | |
| Price of Prior Sale/Transfer | $435,000 | $401,000 | | |
| Data Source(s) | Realist/Metroscan | Realist/Metroscan | | |
| Effective Date of Data Source(s) | 08/20/2009 | 09/19/2008 | | |
| Summary of Sales Comparison Approach | | | | |

*(left margin vertical text: SALES COMPARISON APPROACH)*

| Borrower: Mario Sutic | | | File No.: 70892 |
|---|---|---|---|
| Property Address: 2490 Quail Creek Place | | | Case No.: |
| City: Escondido | State: CA | | Zip: 92027 |
| Lender: Mario Sutic | | | |

**Neighborhood Boundaries**

The subject property is located in the City of Escondido which is located in the northern portion of San Diego County. The immediate subject property neighborhood consists of average to good quality homes on typical residential lots with some homes located on larger land parcels.

The subject property neighborhood is roughly bounded by the 92027 zip code to the north, vacant land to the east, San Pasqual Valley Road to the south and Bear Valley Parkway to the west.

The subject property is located in the "Rancho San Pasqual" development. Homeowner fees are $136.00 for a gated entry, a community pool, spa, clubhouse, recreation facilities, playgrounds and common areas. There is a special assessment(Mello Roos) of approx. $600.00 a year. Homeowner fees are typical for the area with no adverse effect on the value or marketability of the subject property.

**Neighborhood Description**

The subject property is located in the community of Escondido which is approximately 40 miles north of downtown San Diego. The neighborhood is comprised of a mixture of single family residences, multi- family units, and supporting commercial services. The subject has good access to all major services, including schools, shopping, employment centers and major transportation corridors.

**Neighborhood Market Conditions**

The real estate sales market throughout San Diego County rose sharply from November 2000 to the peak price in November 2005 with the median price of a home doubling, rising at an average of 22 percent per year. From December of 2005 through the present time period, the overall market had declined substantially resulting in a large number of bank short sales and foreclosures. From our market research of Data Quick Information Systems, it appears that the overall rate of decline for a median priced home through San Diego County from June of 2008 through June of 2009 was approximately 15.10%. It must be noted that the rate of the decline in value throughout 2008 and the first half of 2009 varies greatly depending upon the submarkets throughout San Diego County with some submarkets actually increasing in value.

Conventional and government insured financing are the predominant forms of financing in the subject's market with seller concessions being offered to entice buyers. According to our searches of the San Diego Multiple Listing Service: the marketing time for the subject area is approximately 0 to 9 months depending upon the original list price of the homes.

**Site Comments**

The preliminary title report for the subject property has not been reviewed. No easements or adverse encroachments were noted during the physical inspection.

The subject property improvement is located on a level pad with 100% net lot utility.

The subject property backs to main entry street for the development (Old Ranch Road), buffered by a rear yard setback of approximately 80 ft. and concrete block wall, no apparent adverse market affect.

**Additional Features**

The subject property has good quality landscaping improvements which includes a rear paver patio area, front covered entry porch, block/wood perimeter fencing. Mature front and rear lawn areas, trees and shrubbery throughout.

Interior features-Wood flooring in entry, kitchen, family room, tile flooring in one of the bathrooms, with carpet throughout the remainder of the improvement. There is a fireplace in family room. The kitchen has tile countertops, good quality cabinets and appliances.

**At the time of inspection, there was no flooring in the main bedroomand bathoom. Also, the main bathroom was completely gutted(No toilet, bathtub,shower enclosure, flooring, sink, cabinets).**

**The subject is being charged with functional obsolescence due to the unfinished bathroom and bedroom.**

**The cost to cure is approx. $7500.00**

**Condition of Improvements**

Physical depreciation was charged due to normal wear and tear. The property has a physical age of 11 years and an effective age of 5 years due to good upkeep. No external obsolescence was noted at the time of the inspection. Remaining economic life is approximately 65 years.

| Borrower: Mario Sutic | | | File No.: 70892 |
| --- | --- | --- | --- |
| Property Address: 2490 Quail Creek Place | | | Case No.: |
| City: Escondido | State: CA | | Zip: 92027 |
| Lender: Mario Sutic | | | |

**Prior Sales Comments**

According to our searches of the Realist.com public tax roll data, the subject property transferred title on 11/19/2003 for $435,000 with a Doc# 1389569.  There are no transfer of title during the last 36 months.

According to our searches of the San Diego Multiple Listing Service, the subject property has not been listed for sale in the last 12 months.

**Comments on Sales Comparison**
**Location**

All of the comparables are located in the subject's development and are considered to be the market competition for the subject property.  All of the comparables are located in the subject's development.

**Lot Size**

All of the comparables have similar overall lot sizes with no adjustments made.

**View**

Comparable No. 3 has a superior view amenity with a downward adjustment needed.

**Age**

No adjustments were deemed warranted for varying ages of the comparables in relation to the subject property. Adjustments, if any, are reflected in the overall condition ratings.

**Condition/Functional Utility**

All of the comparables are similar in overall condition with no adjustments needed.
**As mentioned earlier, the subject is missing flooring in the main bedroom and the main bathroom has been gutted.  Therefore, all of the comparables are superior in functional Utility with downward adjustments necessary.**

**Room Count/Gross Living Area**

Square footage adjustments were made based on $45 per square foot.
All of the comparables have similar bathroom counts with no adustments made.

**Other**

Comparable No. 2 has a superior car storage amenity with a downward adjustment made.
Comparable No. 4 has a pool amenity with a downward adjustment warranted.

**Comments**

Equal weight was given to all comparable sales in determining a final value estimate through the sales comparison approach with additional support from the pending listing utilized.  Comparable No. 3 appears to have been sold at the lower end of the value range.  Adjustments were made from market analysis, the appraiser's knowledge of adjustments for the area and confirmed through conversation with real estate agents active in selling homes in the subject neighborhood.

Comparable No. 4 is a pending listing which has been added for additional support to the final value conclusion.

**All of the comparable sales are "arms-length" transactions with an equally motivated buyer and seller.**

**There is a recent trend in the subject's market area for the agents to list the properties low to increase interest, thus no price negotiation adjustment is necessary.**

**Final Reconciliation**
Consideration has been given to both the sales comparison and cost approaches.  As properties in the subject neighborhood are typically purchased for owner occupied purposes; income approach was not considered applicable in this appraisal.  The cost approach is more useful in valuing new  improvements and was given little consideration in determining a final value estimate. Since the sales comparison approach best indicates the current actions of typical market participants it was given the most weight in this appraisal.

| Borrower: Mario Sutic | | File No.: 70892 | |
| Property Address: 2490 Quail Creek Place | | Case No.: | |
| City: Escondido | State: CA | | Zip: 92027 |
| Lender: Mario Sutic | | | |

**Conditions of Appraisal**
This appraisal has been completed in order to estimate the market value of the subject property. Consideration has been given to all pertinent factors. No conditions to this appraisal report.

**The subject's main bedroom and bathroom have a cost to cure of $7500.00**

DIMENSION LIST ADDENDUM

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA    Zip: 92027 |
| Lender: Mario Sutic | |

| GROSS BUILDING AREA (GBA) | | 1,782 |
|---|---|---|
| GROSS LIVING AREA (GLA) | | 1,782 |

| Area(s) | Area | % of GLA | % of GBA |
|---|---|---|---|
| Living | 1,782 | | 100.00 |
| Level 1 | 1,782 | 100.00 | 100.00 |
| Level 2 | | | |
| Level 3 | | | |
| Other | | | |
| Basement (GBA) | | | |
| Garage | 380 | | |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | Total | | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |

SUBJECT PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA    Zip: 92027 |
| Lender: Mario Sutic | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: August 20, 2009
Appraised Value: $ 415,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA Zip: 92027 |
| Lender: Mario Sutic | |



**COMPARABLE SALE #1**

3132 Olive Knoll Place
Escondido, CA 92027
Sale Date: 08/17/2009
Sale Price: $ 430,000



**COMPARABLE SALE #2**

3119 Olive Knoll Place
Escondido, CA 92027
Sale Date: 07/10/2009
Sale Price: $ 415,000



**COMPARABLE SALE #3**

2440 Fallbrook Place
Escondido, CA 92027
Sale Date: 06/30/2009
Sale Price: $ 415,272

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA    Zip: 92027 |
| Lender: Mario Sutic | |



**COMPARABLE SALE #4**

3128 Ferncreek Lane
Escondido, CA 92027
Sale Date: 08/08/2009 LD
Sale Price: $ 460,000

**COMPARABLE SALE #5**

Sale Date:
Sale Price: $

**COMPARABLE SALE #6**

Sale Date:
Sale Price: $

SUBJECT PHOTO ADDENDUM

| Borrower: Mario Sutic | | File No.: 70892 | |
|---|---|---|---|
| Property Address: 2490 Quail Creek Place | | Case No.: | |
| City: Escondido | State: CA | | Zip: 92027 |
| Lender: Mario Sutic | | | |



SUBJECT'S REAR YARD



SUBJECT'S OFFICE



SUBJECT'S LIVING ROOM

SUBJECT PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA    Zip: 92027 |
| Lender: Mario Sutic | |



SUBJECT'S FAMILY ROOM



SUBJECT'S KITCHEN



SUBJECT'S BATHROOM

SUBJECT PHOTO ADDENDUM

| Borrower: Mario Sutic | | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | | Case No.: |
| City: Escondido | State: CA | Zip: 92027 |
| Lender: Mario Sutic | | |



SUBJECT'S BEDROOM



SUBJECT'S MAIN BEDROOM



SUBJECT'S MAIN BATHROOM

FLOORPLAN

| Borrower: Mario Sutic | | File No.: 70892 | |
| Property Address: 2490 Quail Creek Place | | Case No.: | |
| City: Escondido | State: CA | | Zip: 92027 |
| Lender: Mario Sutic | | | |



| SKETCH CALCULATIONS | Perimeter | Area |
|---|---|---|
| **Living Area** | | |
| First Floor | | 1782.0 |
| **Total Living Area** | | **1782.0** |
| **Garage Area** | | |
| Attached Garage | | 380.0 |
| **Total Garage Area** | | **380.0** |

PLAT MAP

| Borrower: Mario Sutic | | File No.: 70892 | |
| Property Address: 2490 Quail Creek Place | | Case No.: | |
| City: Escondido | | State: CA | Zip: 92027 |
| Lender: Mario Sutic | | | |

LOCATION MAP

| | |
|---|---|
| Borrower: Mario Sutic | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | Case No.: |
| City: Escondido | State: CA | Zip: 92027 |
| Lender: Mario Sutic | |



SUBJECT PROPERTY INFORMATION

| Borrower: Mario Sutic | | File No.: 70892 |
| Property Address: 2490 Quail Creek Place | | Case No.: |
| City: Escondido | State: CA | Zip: 92027 |
| Lender: Mario Sutic | | |



**2490 Quail Creek Pl**
**Escondido, CA 92027-6740**
**San Diego County**

### Owner Info:

| | | | |
|---|---|---|---|
| Owner Name : **Sutic Mario** | | Tax Billing Zip+4 : **6740** |
| Owner Name 2 : **Sutic Ljiljana** | | Recording Date : **11/19/2003** |
| Tax Billing Address : **2490 Quail Creek Pl** | | Annual Tax : **$5,736** |
| Tax Billing City & State : **Escondido CA** | | County Use Code : **1 Family Residence** |
| Tax Billing Zip : **92027** | | Universal Land Use : **SFR** |

### Location Info:

| | | |
|---|---|---|
| Tract Number : **13287** | Flood Zone Panel : **0602901082F** |
| Subdivision : **Escondido Tr 706r-L** | School District : **Escondido Un** |
| Zoning : **1** | Map Coordinates : **1130-H4** |
| Census Tract : **207.09** | Carrier Route : **R013** |
| Flood Zone Code : **X** | Flood Panel Date : **06/19/1997** |

### Tax Info:

| | | |
|---|---|---|
| Tax ID : **241-220-43-00** | Improved Assessment : **$188,000** |
| Tax Year : **2008** | Total Assessment : **$380,000** |
| Annual Tax : **$5,736** | % Improv : **49%** |
| Homestead : **Homeowner** | Tax Area : **04276** |
| Assessment Year : **2009** | Legal Description : **Lot 43** |
| Land Assessment : **$192,000** | Lot Number : **43** |

### Characteristics:

| | | |
|---|---|---|
| Lot Acres : **.1803** | Total Baths : **2** |
| Lot Sq Ft : **7854.7239** | Full Baths : **2** |
| Building Sq Ft : **1,793** | Garage Type : **Garage** |
| Total Units : **1** | Garage Capacity : **3** |
| Bedrooms : **3** | Effective Year Built : **1998** |

### Last Market Sale:

| | | |
|---|---|---|
| Recording Date : **11/19/2003** | Owner Name : **Sutic Mario** |
| Settle Date : **10/16/2003** | Owner Name 2 : **Sutic Ljiljana** |
| Sale Price : **$435,000** | Seller : **Jackson Mark L & Stacy R** |
| Document No : **1389569** | Price Per Sq Ft : **$242.61** |
| Deed Type : **Grant Deed** | |

### Sales History:
**More History**

| | | | | |
|---|---|---|---|---|
| Recording Date : | **07/01/2004** | **11/19/2003** | **11/19/2003** | **10/29/1997** |
| Sale Price : | | **$435,000** | | **$201,500** |
| Nominal : | **Y** | | **Y** | |

Marston Residential Appraisal Group, Inc.

File No. 70892

********* INVOICE *********

File Number: 70892                                    08/20/2009

Dave Benavides
Potter and Handy

Borrower :          Mario Sutic

Invoice # :         70892
Order Date :
Reference/Case # :
PO Number :

JC

2490 Quail Creek Place
Escondido, CA  92027

|  | | |
|---|---|---|
| Fee For Professional Appraisal Services | $ | 375.00 |
|  | $ | -------------- |
| Invoice Total | $ | 375.00 |
| State Sales Tax @ | $ | 0.00 |
| Deposit | ($ | ) |
| Deposit | ($ | 375.00 ) |
|  |  | -------------- |
| Amount Due | $ | 0.00 |

Terms:   Check # 22238 rcvd

Please Make Check Payable To:

Marston Appraisal Group, Inc.
1525 South Escondido Boulevard, Ste. E
Escondido, CA 92025

Fed. I.D. #: 33-0453787

Marston Residential Appraisal Group, Inc.  1525 South Escondido Boulevard, Escondido CA 92025